Filed 6/30/25  Ramirez v. Bala CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANAHI RAMIREZ  Plaintiff and Respondent,  v.  CHAD BALA,  Defendant and Appellant. | H049689  (Monterey County  Super. Ct. No. 18CV003655) |
| ANAHI RAMIREZ  Plaintiff and Respondent,  v.  CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION and CHE WHITE,  Defendants and Appellants. | H049702  (Monterey County  Super. Ct. No. 18CV003655) |
| ANAHI RAMIREZ  Plaintiff and Appellant,  v.  CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION and CHE WHITE,  Defendants and Appellants. | H050113  (Monterey County  Super. Ct. No. 18CV003655) |

In these coordinated appeals, defendants challenge a judgment following a jury verdict in plaintiff Anahi Ramirez's favor on her Fair Employment and Housing Act (FEHA) claims, as well as a subsequent judgment awarding her attorneys' fees and costs.

Ramirez and Luis Serna, her boyfriend at the time, were employees with the California Department of Corrections and Rehabilitation (CDCR) at its Correctional Training Facility in Soledad (prison). In January 2017, Serna recorded the two of them having sex, and then showed and distributed the video to numerous prison co-workers without Ramirez's knowledge or consent. Eventually, more than a dozen prison employees acknowledged seeing the video, while Serna admitted discussing it with upwards of 50 people at work.

In March 2018, Ramirez learned that the video had been circulating at the prison for over a year and she had been interacting with numerous officers who had viewed and distributed it. Ramirez immediately reported the information to the warden and the prison's investigative services unit (ISU).

After failing to get a satisfactory response, Ramirez submitted a separate equal employment opportunity complaint to CDCR's office of internal affairs in June 2018. Still dissatisfied with the responses, Ramirez sued CDCR, Serna, and appellant Che White in September 2018, asserting causes of action for sexual harassment and failure to prevent discrimination and harassment in violation of FEHA.

Ramirez felt her co-workers were treating her differently following her complaints, while some men behaved inappropriately toward her, including one who told her he was looking for someone to have sex with. Ramirez also continued to learn of additional co-workers who had seen and discussed the video. As a result, she felt her workplace environment had become hostile, embarrassing, and stressful.

In August 2019, Ramirez left her job at CDCR because she "just couldn't take it anymore." She then amended her complaint to name additional defendants who had

2

allegedly viewed, shared, and discussed the video—including appellant Chad Bala—and to add new causes of action against CDCR for sex discrimination and retaliation.

Following summary judgment motions, the matter proceeded to trial in September 2021 against CDCR, Serna, Bala, and White. The jury ultimately returned a verdict in Ramirez's favor on her claim of harassment—against CDCR, Serna, Bala, and White— and her claims of discrimination and failure to prevent harassment and discrimination against CDCR. The verdict awarded Ramirez $709,555 plus interest in damages. The trial court later awarded Ramirez $1,385,546 in attorneys' fees and costs.

On appeal, Bala argues FEHA precludes the imposition of "indirect liability" on him for the unlawful acts of others, and substantial evidence does not support the jury's findings that the harassing conduct occurred in a work-related context or was severe or pervasive.

In their separate appeal, CDCR and White similarly argue that, as a matter of law, CDCR cannot be held liable under FEHA for the private sharing of a sex video amongst coworkers using personal phones during off-duty hours, and that substantial evidence does not support the jury's verdict.

Finally, in the third appeal, CDCR and White argue that the trial court abused its discretion in applying a multiplier to the attorneys' fees award.

Finding no error or abuse of discretion, and determining that substantial evidence supports the jury's verdict, we affirm the judgments.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Employment with CDCR

Ramirez began working at the prison in 2012 as an office technician through a temporary employment agency. She joined the prison as a full-time employee in 2013. In 2017 and 2018, during the times relevant to this appeal, Ramirez worked as an office technician in the prison's custody department, and later at the prison's central and north facilities, reporting to Captain Donnie Metcalf and later Captain Keith Mensing.

3

### B. Relationship with Serna and recording of the video

In October 2016, Ramirez began dating Serna, a correctional officer at the prison. One evening in January 2017, the two were drinking together at Ramirez's house in Salinas. The last thing Ramirez remembered of the evening was Serna taking her blouse off.

The next morning, as she was trying to remember "bits and pieces of the night," she recalled an image of having "seen [her] face in a phone." She immediately texted Serna, who had since left her house, and asked him if he had taken a video of them the night before. Serna replied, "Oh, lol. And, yes, I took videos, but I erased them all. My kids play on my phone at times." Ramirez answered, "Oh, good. I got kind of worried."

Ramirez was concerned that Serna had recorded them having sex, and she was relieved when he said he had deleted the video. She did not recall giving Serna consent to record them, and she never consented to him sharing the video with anyone.

In May or June 2017, Ricardo Bravo, a correctional officer at the prison, asked Ramirez at work if the rumors were true that a video of her and Serna having sex was circulating at the prison. Bravo told Ramirez that he had heard about the video from Willie Morales, another correctional officer at the prison.

Ramirez confronted Serna and asked if he had actually deleted the video as he had told her in January 2017. Serna initially assured Ramirez that he had deleted the video, but eventually admitted to having shown the video to one friend. He continued to insist, however, that he had never sent it to anyone. Ramirez was upset with Serna for lying to her and showing the video to someone. After arguing and not speaking for a week or two, they eventually reconciled, although according to Ramirez, the relationship was not the same.

### C. Continued circulation of the video

In March 2018, Ramirez received a phone call from her friend Sonya Haley, a nurse at the prison and the vice president of the union at the time. Haley told Ramirez

4

that she had received a phone call from another prison nurse, Heather Block, who said that a video of Ramirez having sex with an officer at the prison had been sent to her husband Mitch Haynes, another correctional officer at the prison, and that the video was circulating at the prison. Block had called Haley and asked her to share the information with Ramirez, because Block knew that Haley and Ramirez were friends.

Haley later submitted a report of these conversations to the prison warden, Craig Koenig. In that report, Haley stated that Block had told her she "could get the video" if necessary. Haley testified that she never received a response to that report.

Ramirez again confronted Serna and asked him if he had shared the video with anyone. Serna initially denied it, but then admitted to having shared the video with Roy Muñoz, a correctional officer at the prison. He also told Ramirez that he may have shown the video to another correctional officer, Johnny Mariscal.

### D. Initial internal complaint and investigation

The morning after she received the phone call from Haley, Ramirez reported the information to her supervisor, Metcalf. Metcalf suggested that Ramirez speak with Victor Khan, a lieutenant in the prison's ISU. The ISU is a department within the prison responsible for, among other things, investigating complaints about staff misconduct. Ramirez and Khan met the next day. At the meeting, Ramirez told Khan she wanted "the circulation of the video to stop." However, she told Khan she did not want to file a complaint or an equal employment opportunity complaint.

On March 29, 2018, Ramirez submitted a memo to Khan, summarizing what she knew of the events to date. In addition to recounting what had transpired, Ramirez reported that, "[s]ince this 'tape' has been passed around at the Correctional Training Facility (CTF), for over a year without my knowledge, I am at point where I feel embarrassed to come to work, but since its all already out there and I might well in fact [have been] face to face with the many officers that viewed and distributed that video, I am trying to keep it together and not break."

5

A few days after Ramirez met with Khan, Warden Koenig asked to meet with her. At that meeting on March 30, 2018, Koenig told Ramirez "there was nothing he could do about the distribution, that it was Serna's phone, and he could do whatever he wanted with his phone, and that he had no control over what his officers were doing outside of the workplace, that he had to be honest that there was nothing that he could do for me, that the video itself could be out there, so there was nothing that he could really do."

Koenig also informed Ramirez that he had already spoken with Serna about the video. Serna had admitted to Koenig that he had also shown the video to another co-worker, defendant Che White, a correctional officer who supervised both Ramirez and Serna.

On April 9, 2018, Ramirez sent a memo to Khan summarizing her meeting with Koenig. She stated, among other things, that Koenig "goes on to tell me that he's not judging. He then said something about Kim Kardashian's and celebrities making sex tapes. That people made tapes. and he was not judging. So basically insinuating that we made a video and in a way I felt that I was slut shamed. I couldn't understand why he initially said he was not judging me. I was experiencing some type of anxiety in fact, as I been nervous about the whole situation at work."

Ramirez also sent additional memos to Khan on April 9, 2018, summarizing conversations she had had with Serna back in March, during which Serna told her that he had heard that Michael Graves, a sergeant at the prison, had a copy of the video and had offered to show it to an unnamed captain, who apparently declined to watch it. In addition, Serna had told Ramirez that Block had seen the video and had "spread the word amongst the nursing staff," but had not reported it to any supervisor.

In the meantime, after Khan had initially met with Ramirez on March 28, 2018, he had contacted Serna, White, Bravo, Muñoz, Haynes, Morales, and Carlos Portillo—another correctional officer—and directed each of them to prepare a memo summarizing their actions with respect to the video.

6

Serna reported that he had recorded "numerous" videos of him and Ramirez engaging in sexual acts that night in January 2017. A few days later, he initially showed two of the videos to some friends, including Muñoz, at a family gathering. Later that night, Serna texted a copy of one of the videos to Muñoz and White. White responded to the text by saying, "You're a savage."

White confirmed that he had seen the video after Serna sent it to him, and reported that "[a]t no time did I forward the video nor I recall showing it to anyone[,] [h]owever, due to the large time [lapse] I cannot be for certain."

Muñoz confirmed that he had seen the video after Serna sent it to him, and reported that he had sent it to Sergio Zamora, another correctional officer at the prison, a few days after receiving it. Zamora confirmed that he had received the video from Muñoz, and reported that he had watched it and then deleted it, without sending it to anyone else.

Haynes reported that on March 26, 2018, Gustavo Ramirez, another correctional officer at the prison, asked him if he had heard about a sex video of Ramirez and Serna circulating at the prison. Haynes had not yet heard that rumor at the time.

Morales reported that, several months earlier, he was approached at the prison gym by Peter Paluck, another correctional officer at the prison and the president of the union, who showed him a video of Ramirez and Serna having sex. Morales also confirmed that he had mentioned the video to Bravo in March 2018, but Bravo responded that he did not want to hear anything about it.

In a subsequent 2019 interview with ISU as part of the prison's preliminary criminal investigation into Serna, Paluck stated that he had received the video from John Childers, another correctional officer at the prison, via text on January 23, 2018, with the message, "this is Captain Mensing's secretary – Bala says she's fucking hot." Paluck also admitted to showing the video to Angel Sedano, another correctional officer at the prison, and discussing it with defendant White.

7

Childers later testified that he had received the video via text message from Bala, a sergeant and Childers's supervising officer at the prison. Bala testified that he initially received the video via a group text from an unrecognizable number. He viewed the video and recognized Ramirez as an employee with the prison.

The same day Bala received the video and sent it to Childers, he also discussed it via CDCR e-mail with Flavio Haro, a sergeant at the prison. Haro e-mailed Bala with a subject line "Video," and the message, "SERNA is the dude." Bala responded that same day: "That's awesome."

### D. *Internal complaints and initial lawsuit*

Khan believed the information reported to him constituted conduct in violation of the prison's sexual harassment policy as to Serna, White, Muñoz, and Paluck. Khan submitted a "confidential request for internal affairs investigation and notification of direct adverse action" on April 11, 2018 (request for investigation). The request for investigation stated: "The Correctional Training Facility (CTF) Hiring Authority is requesting an Internal Affairs Investigation of [Serna, White, Paluck, and Muñoz] for Harassing anyone based upon race, color, national origin, ancestry, sex, religion. marital status. age. disability, medical condition, pregnancy, sexual orientation, veteran status or political affiliation and Failure to observe and perform within the scope of training. [¶] It is alleged, that [Serna] forwarded a video recording of [Ramirez] while engaged in a sexual act together. Serna forwarded the video recording to Muñoz and White. Paluck, while on duty, showed the video recording to Officer Willie Morales. [¶] Based on the information / documentation, the CTF Hiring Authorities are requesting an Internal Affairs Investigation into the aforementioned allegations."

Following Khan's submission of the request for investigation, Ramirez followed up with him on multiple occasions seeking updates on the status. After Khan retired from the prison in May 2018, Ramirez then followed up with Khan's successor seeking further updates, but she received none.

Ramirez then submitted an equal employment opportunity complaint to CDCR's office of internal affairs on June 7, 2018. She received a response on June 18, 2018, which stated: "After performing a review of this complaint and working with the Investigative Services Unit at CTF, it was determined that these allegations have already been forwarded to OIA and accepted as an investigation, which is currently open."

Ramirez testified that she then followed up with the office of internal affairs by phone, but was told that the investigation had been closed by their office, and had been returned to the prison, which would decide whether there would be any further investigation.

Ramirez filed the initial complaint in this action on September 26, 2018, naming CDCR, Serna, Muñoz, and White as defendants, and asserting causes of action for sexual harassment in violation of FEHA against all defendants, and failure to prevent discrimination and harassment in violation of FEHA against CDCR only.

### E. Workplace environment

Ramirez testified that her workplace environment became hostile and uncomfortable after she reported the information to Khan and filed her complaints. Co-workers began giving her "the cold shoulder" and treating her differently. Officers with whom she had had a good rapport no longer engaged in conversations with her. Ramirez wondered every day who else had seen the video, so that "any officer that opened the door for me that day, he could have been a potential person [who] had seen the video. I didn't know." As a result, Ramirez was stressed out and uncomfortable at work.

She also testified that some men at work behaved inappropriately with her. A lieutenant stopped by her office one day and "straight out told me, like, that he was looking for someone to have sex with, if I knew of anybody that was interested. He was looking to have an affair." Another man asked her, "When are you going to take me to hike with you?" Ramirez responded by asking him, "Aren't you married?" to which he replied, "Yeah, but my wife doesn't have to know."

Because she was not receiving any updates from CDCR or the prison in response to her complaints, Ramirez felt "abandoned." She testified that "[t]here was nothing going on. Nobody was giving me updates. I had already complained twice, once to CTF and once to OIA. So I just felt nothing was going on. There was nothing that -- I was still working with my aggressors or potential aggressors. It just made it difficult for me to come to work and, like I mentioned before, having to possibly work with the same people that saw me on the video naked."

The situation, she testified, took her "into a very dark place." She became depressed, had difficulty sleeping, began suffering panic attacks, and "wanted to die at some point." Eventually, she began seeing a therapist and psychiatrist, and took a medical leave of absence from work in April 2019.

Ramirez testified that her interactions with defendant White were particularly uncomfortable. She felt that White was "haunting" and provoking her, often staring at her as he passed by her office. On June 5, 2019, Ramirez submitted a memo to Metcalf complaining about having to work with White: "I want to report that about two weeks ago. Lt. Che White was assigned to work in the opposite yard (B) area. While he was assigned to B Yard, he remained at my work area during his shift. I've made two sexual harassment complaints against Mr. White to the prison, and I am extremely uncomfortable working with him. I ask that the prison not assign Lt. White to work in work area." Notwithstanding her request, White was again assigned to work in the vicinity of Ramirez.

Ramirez left CDCR at the end of August 2019. She testified that she "just couldn't take it anymore. Nothing was being done. Everybody that I, at least, known was still working. There was no activity, or, at least, I wasn't getting any updates from the prison as far as how the investigation was going, or -- I just couldn't handle it anymore, so I just decided to leave."

### F. Investigations and resulting discipline

Following Khan's initial investigation, Koenig had requested on October 5, 2018, that the office of internal affairs initiate a criminal investigation of Serna. That investigation commenced on October 24, 2018, and alleged that Serna had violated Penal Code section 632 and section 647, subdivision (j)(4), for his actions regarding the video. Ultimately, on May 10, 2019, the Monterey County district attorney declined to bring criminal charges against Serna.

Meanwhile, the prison's office of internal affairs did not initiate its administrative investigation of Serna in response to Ramirez's initial March 2018 complaint—for the purpose of evaluating staff misconduct for disciplinary purposes—until May 1, 2019.

Bala, Paluck, and White were eventually added to the administrative investigation. In the course of that investigation, the office of internal affairs conducted interviews with Ramirez, White, Arroyo, Morales, Gustavo Ramirez, Portillo, Haynes, Paluck, Graves, Zamora, Serna, Bala, Childers, Sedano, and Block.

The administrative investigation resulted in notices of adverse action issued to Serna, Bala, and Paluck in November 2019, pursuant to Government Code section 19574.[1] The notices provided that Serna would be dismissed from his position as a correctional officer as of November 7, 2019, based on statutory findings of inexcusable neglect of duty, discourteous treatment of the public or other employees, willful disobedience, failure of good behavior, and unlawful discrimination including harassment, pursuant to section 19572.

---

[1] Government Code section 19574 is part of the statutory scheme through which a permanent state employee may be dismissed or otherwise disciplined. (*Rodgers v State Personnel Board* (2022) 83 Cal.App.5th 1, 10 [employer must first determine whether there is cause for discipline and, if so, what discipline to impose; due process requires employer to provide notice of and reasons for proposed disciplinary action and provide opportunity to respond]; Gov. Code, §§ 19574–19588.) Subsequent undesignated statutory references are to the Government Code.

Bala's pay would be reduced by 10 percent for a one-year period—and Paluck's by five percent for a three-year period—beginning on December 1, 2019, based on the same statutory findings made against Serna.

Ultimately, CDCR accepted Serna's resignation in lieu of dismissal, and reduced the penalties against Bala and Paluck to a five percent pay cut for eight months, and a 10 percent pay cut for one year, respectively.

No other employees were disciplined as a result of the investigation.

### G. Summary judgment and trial

After initially filing suit in September 2018, Ramirez amended the complaint to add Bala, Paluck, and Childers as additional defendants. She also amended the complaint following her departure from CDCR to add a FEHA cause of action for sex discrimination and retaliation against CDCR.[2]

The operative first amended complaint (FAC) thus stated the following causes of action: (1) sexual harassment in violation of FEHA (§ 12940, et seq.) against all defendants; (2) failure to prevent discrimination and harassment in violation of section 12940, subdivision (k), against CDCR; (3) sex discrimination in violation of section 12940, subdivision (a), against CDCR; and (4) unlawful retaliation in violation of section 12940, subdivision (h), against CDCR.

On May 20, 2021, CDCR, White, Childers, and Muñoz jointly filed a motion for summary judgment. They argued chiefly that: (1) all claims against CDCR must be dismissed because the department cannot be held liable for private, off-duty conduct that bore no nexus to the workplace; (2) the FEHA harassment claim must be dismissed because Ramirez had failed to show that she suffered a hostile work environment due to her sex; (3) the FEHA discrimination and retaliation claims must be dismissed because Ramirez had failed to show that an adverse job action was taken against her, or that any

---

[2] Ramirez later dismissed Paluck as a defendant following his death in 2021.

job action was taken because of animus against her sex; (4) the FEHA retaliation claim fails because Ramirez cannot show a causal link between any adverse action and a protected activity; (5) the FEHA failure to prevent harassment claim fails because CDCR promptly investigated Ramirez's allegations and took prompt remedial action; and (6) the claim for punitive damages against CDCR must be denied.

The trial court denied the motion as to CDCR, finding that Ramirez had produced sufficient evidence to raise a triable issue of fact as to her claims, including that: CDCR admitted in the discipline notices sent to Serna, Bala, and Paluck that harassment had occurred; White received and viewed the video; Ramirez complained in March 2018 about the video being circulated; White had been questioned by CDCR in April 2018 and admitted he had seen the video, but did not report it; Koenig told Ramirez he could not do anything about the video; CDCR did nothing to initiate an investigation for over a year after Ramirez complained; White was assigned to her unit in May 2019 after she had complained and after the investigation began; White occasionally supervised Ramirez and spent time near her office with no apparent reason to be there, staring at her; Metcalf did not move White elsewhere even after Ramirez complained; the discipline imposed on Bala and Paluck was reduced; and married officers had asked Ramirez on dates.

The trial court granted the motion as to Childers and Muñoz, stating that "[t]here is no evidence Childers or Muñoz shared this video while at work or in a work context, and there is no evidence that they ever subjected Plaintiff to unwelcome sexual advances, conduct or comments. There is no evidence they subjected Plaintiff to any retaliation."

The case then proceeded to a jury trial against the remaining defendants in September 2021. After six days of testimony and closing arguments, the matter was submitted to the jury on September 24, 2021, by way of a special verdict form.[3]

_____

[3] "[A] special verdict is that by which the jury find the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as (continued)

13

### H. Jury verdict and judgment

The jury returned its verdict on September 28, 2021.

With respect to the sexual harassment cause of action against CDCR, the jury found in Ramirez's favor, determining that she was subjected to harassing conduct because of her sex; the harassing conduct occurred in a work-related context; the harassment was severe or pervasive; a reasonable woman in Ramirez's circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; Ramirez did consider the work environment to be hostile, intimidating, offensive, oppressive, or abusive; a supervisor participated in, assisted in, or encouraged the harassing conduct; CDCR or its supervisors knew or should have known of the harassing conduct; CDCR or its supervisors failed to take immediate and appropriate corrective action; and, the harassing conduct was a substantial factor in causing harm to Ramirez.

With respect to the sex discrimination cause of action against CDCR, the jury found in Ramirez's favor, determining that CDCR constructively discharged her; sex was a substantial motivating reason for the constructive discharge; and the constructive discharge was a substantial factor in causing Ramirez harm.

With respect to the failure to prevent harassment or discrimination cause of action against CDCR, the jury found in Ramirez's favor, determining that CDCR failed to take all reasonable steps to prevent harassment or discrimination, and that the failure was a substantial factor in causing harm to Ramirez.

With respect to the retaliation cause of action, the jury found in CDCR's favor, determining that Ramirez's complaining about sexual harassment was not a substantial motivating reason for her constructive discharge.

---

established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

With respect to the work environment harassment causes of action against White, Bala, and Serna, the jury found in Ramirez's favor as to all three, determining that she was subject to harassing conduct because she was a woman; the harassing conduct occurred in a work-related context; the harassment was severe or pervasive; a reasonable woman in Ramirez's circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; Ramirez did consider the work environment to be hostile, intimidating, offensive, oppressive, or abusive; White, Bala, and Serna each individually participated in, assisted in, or encouraged the harassing conduct; and the harassing conduct was a substantial factor in causing Ramirez harm.

The jury awarded Ramirez $59,555 in economic damages and $650,000 in mental suffering and emotional distress damages, apportioning fault between the parties as follows: 40 percent to CDCR, nine percent to White, 11 percent to Bala, and 40 percent to Serna.

Judgment on the jury verdict was entered on October 26, 2021. Notice of entry of judgment was filed and served on November 9, 2021.

Following motions for judgment notwithstanding the verdict and for a new trial, which the trial court ultimately denied, defendants timely appealed.

### I. Attorneys' fees

Ramirez filed a motion for fees on January 10, 2022, seeking $1,300,530 in attorneys' fees and $28,287.50 in expert fees. Following briefing and a hearing, the trial court awarded Ramirez $1,298,983.50 and $28,287.50, respectively (attorneys' fees order).

### J. Amended judgment and appeals

An amended judgment was entered on April 22, 2022, incorporating the jury verdict and providing updated amounts of $709,555 in damages, $1,298,983.50 in attorneys' fees, $28,287.50 in expert witness fees, and $58,275.79 in costs, with defendants to be jointly and severally liable.

15

The amended judgment was therefore for a total of $2,095,101.29, with interest thereon at the rate of 10 percent per year from the date of the entry of this judgment until paid.

CDCR and White timely appealed the attorneys' fees order.

On this court's own motion, the three appeals—(1) CDCR and White's appeal on the merits (H049702), (2) Bala's appeal on the merits (H049689), and (3) CDCR and White's appeal of the attorneys' fees and costs award (H050113)—were ordered to be considered together for purposes of briefing, oral argument, and disposition.

## II. DISCUSSION

In appeal H049689, Bala argues that his conduct by itself did not constitute unlawful harassment because he did not engage in any improper work-related conduct toward Ramirez, or in any "severe and pervasive conduct." Instead, he argues, the essence of Ramirez's claim was that Bala's conduct resulted in other individuals acting in a manner that created a hostile and abusive working environment. In addition, Bala argues that the trial court committed reversible error by giving the jury a verdict form that improperly conflated harassment liability with aider and abettor liability.

In appeal H049702, CDCR and White argue that: (1) as a matter of law, CDCR cannot be held liable under FEHA for purely private, off-duty conduct, and that the "tangential impact" to the workplace from gossip about the sex video does not amount to workplace harassment; (2) substantial evidence does not support the sexual harassment verdict against CDCR and White because the harassment was not sufficiently severe or pervasive; (3) substantial evidence does not support the sex discrimination verdict because Ramirez was not subjected to an adverse employment action and CDCR had legitimate non-discriminatory reasons for the course and progression of the investigations and disciplinary decisions.

16

Lastly, in appeal H050113, CDCR and White argue that, even if the judgment on the merits is not reversed, the attorneys' fees award must be reversed because the trial court abused its discretion in awarding a multiplier.

We begin with a brief overview of FEHA before addressing the three appeals in turn.

## A. FEHA

FEHA was formed in 1980 as part of a recodification of the former Fair Employment Practices Act and the Rumford Fair Housing Act. (*Rojo v. Kilger* (1990) 52 Cal.3d 65, 72 (*Rojo*); § 12900, et seq.) FEHA generally "establishes that freedom from job discrimination on specified grounds, including sex, is a civil right." (*Rojo, supra*, at p. 72; § 12921.) "It declares that such discrimination is against public policy (§ 12920) and an unlawful employment practice (§ 12940)." (*Rojo, supra*, at p. 72, citing *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 213.)

Section 12940 begins with the proclamation that "[i]t shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California … ." for employers, employees, and others to engage in certain specified acts. (§ 12940; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1161 (*Lodge at Torrey Pines*).) The statute then lists several subdivisions defining the various unlawful employment practices including, relevant to this appeal, prohibitions on discrimination, retaliation, and harassment. (§ 12940; *Lodge at Torrey Pines, supra,* at p. 1161.)

Subdivision (a) defines an unlawful employment practice as "an employer's refusal to hire, employ, or select for a training program leading to employment, any person because of that person's 'race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual

orientation.' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1042 (*Hughes*); § 12940, subd. (a).)

Subdivision (h) provides that it is unlawful for any employer or person to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) "This form of unlawful employment practice is often called simply 'retaliation.' " (*Lodge at Torrey Pines, supra*, 42 Cal.4th at p. 1162.)

Subdivision (j) prohibits various forms of harassment, including sexual harassment of an employee. (§ 12940, subd. (j)(1); *Hughes, supra*, 46 Cal.4th at p. 1035.) Prohibited sexual harassment "ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is 'hostile or abusive to employees because of their sex.' " (*Hughes, supra,* at p. 1042, quoting *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 (*Miller*).)

A hostile work environment is only actionable "when the harassing behavior is *pervasive or severe*," so as "to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." (*Hughes, supra,* 46 Cal.4th at p. 1043.; see also, *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 (*Lyle*) [no recovery for occasional, isolated, sporadic, or trivial harassment].)

Significantly, though, "the existence of a hostile work environment depends upon 'the totality of the circumstances.' " (*Hughes, supra*, 46 Cal.4th at p. 1044.) Even conduct "that took place outside of the physical work environment is part of the totality of the circumstances [a court will] evaluate when considering a hostile work environment claim." (*Okonowsky v. Garland* (9th Cir. 2024) 109 F.4th 1166, 1180 (*Okonowsky*),

citing *Little v. Windermere Relocation, Inc.* (9th Cir. 2002) 301 F.3d 958, 966-968.)[4] Offsite or third-party conduct "can have the effect of altering the working environment in an objectively severe or pervasive manner." (*Okonowsky, supra*, at p. 1180.)

Because FEHA is not a civility code, it "was not intended to protect employees against all offensive, boorish, rude, obnoxious, or vulgar conduct in the workplace." (*Lyle, supra,* 38 Cal.4th at p. 295; see also *Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1061.) Determining whether certain conduct was severe or pervasive includes consideration of any or all of the following: the nature of the conduct, how often and over what period of time it occurred, the circumstances under which it occurred, whether it was physically threatening or humiliating, and the extent to which it unreasonably interfered with the employee's work performance. (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 38–39 (*Caldera*); CACI No. 2524 [" 'Severe or Pervasive' Explained"].)

Moreover, the conduct must be both objectively and subjectively offensive. (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377 (*Jones*).) "That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception." (*Lyle, supra*, 38 Cal.4th at p. 284.)

Whereas discrimination and retaliation claims under FEHA focus on the conduct of employers, harassment claims focus on the conduct of employers as well as " 'any other person.' " (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931 (*Pollock*); *Lodge at Torrey Pines, supra*, 42 Cal.4th at p. 1160; § 12940, subd. (j).) Subdivision (j)(3) of section 12940 expressly provides that individual employees may be

---

[4] In interpreting FEHA, "California courts often look for guidance to decisions construing federal antidiscrimination laws, including title VII of the federal Civil Rights Act of 1964." (*Raines v. U.S. Healthworks Medical Group* (2023) 15 Cal.5th 268, 282.)

"personally liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action." (§ 12940, subd. (j)(3); see also, 8 Witkin, Summary 11th Const Law § 1028 (2024).)

An employer's lackluster or inadequate response to a complaint may also be construed as reinforcing rather than remediating prohibited conduct, thereby "cementing the discriminatory effect" of the behavior within the workplace. (*Okonowsky, supra,* 109 F.4th at p. 1182; see also, *Fuller v. Idaho Department of Corrections* (9th Cir. 2017) 865 F.3d 1154, 1164 [employer reacted to prohibited conduct in ways that allowed the effects to "permeate [her] work environment and alter it irrevocably"].)

### B. *Standards of review*

We review the jury's factual findings for substantial evidence. (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251 (*Mathews*).) "We will reverse a jury's verdict only if it is unsupported by any substantial evidence, meaning to prevail on appeal defendants must show that the evidence was such as would justify a directed verdict in their favor. When applying the substantial evidence test, 'we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict." ' We do not reweigh the evidence or judge the credibility of witnesses. The 'power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict.' " (*Ibid*., citations omitted; see also, *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 715 [substantial evidence review of trial court's denial of a motion for JNOV] (*Atkins*).)

Where applicable, we review questions of statutory interpretation, and the application of a statutory standard to undisputed facts, de novo. (*Atkins, supra*, 8 Cal.App.5th at p. 715, citing *Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.)

## C.  Bala's appeal (H049689)

Bala's arguments on appeal fall into two categories.  First, he argues that, as a matter of law, FEHA precludes the imposition of "indirect liability" on him for the unlawful acts of others.  As part of that argument, he contends that the trial court committed reversible error by giving the jury an improper verdict form that asked, "Did Chad Bala participate in, assist in, or encourage the harassing conduct?"

Second, he argues that substantial evidence does not support the jury's findings that the harassing conduct occurred in a work-related context, and that it was severe or pervasive.

### 1.  "Indirect liability" arguments

Bala makes three distinct arguments which we construe as presenting the same general contention.  First, he argues that, "under the plain meaning of section 12940, an individual employee can only be liable where that employee's conduct, standing alone, constitutes discriminatory harassment in violation of the FEHA."  He cites the language of section 12940, subdivision (j)(3), which provides that an employee is personally liable for any prohibited harassment "perpetrated by the employee."  (§ 12940, subd. (j)(3).)  According to Bala, the use of the word "perpetrated" in the statute demonstrates Legislative intent that the employee must actually commit the harassment to be found liable.  "In short," he argues, the "plain meaning of subdivision (j) of section 12940 does [not] support the type of indirect liability that has been imposed on [him] in this lawsuit."

Second, Bala relies on the "history and text" of FEHA as a whole, in addition to Title VII of the Civil Rights Act of 1964, which allegedly show that "an employee cannot be held indirectly liable for actions of other employees."  According to Bala, this history and text demonstrate that, because "an employee is not under [the] general duty to ensure a workplace free of discriminatory harassment, there is no basis for holding an individual employee liable based on the conduct of other employees."

21

Third, Bala argues that the special verdict form incorrectly stated the law by asking the jury to determine whether Bala participated in, assisted in, or encouraged the harassing conduct. In doing so, Bala contends, the special verdict form "conflated liability for perpetrating harassment with liability for aiding and abetting."[5] That "allowed the jury to find against [him] on an aider and abettor type of theory without having to determine whether the elements of aiding and abetting have been met."

At bottom, these arguments make the same core contention—the special verdict form was defective, either because it did not properly ask the jury to determine whether Bala "perpetrated" the harassment pursuant to subdivision (j)(3), or because it did not ask the jury to determine the remaining elements of an aiding and abetting theory of liability. (See, e.g., *Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 616–617 [where jury returned a complete verdict consistent with instructions on the form, appellant's challenge amounted to an objection to the form of the verdict and the issues as determined by the verdict].)

We need not reach this issue, though, because we conclude that Bala has forfeited any challenge to the special verdict form by not objecting to it below. It is well-settled that the "[f]ailure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected." (*Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 521; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242–1243 (*Taylor*); *Keener v. Jeld–Wen, Inc.* (2009) 46 Cal.4th 247, 263–264 (*Keener*).)

---

[5] In addition to the subdivisions in section 12940 discussed above, the statute also provides that it is unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so." (§ 12940, subd. (i).)

"The obvious purpose for requiring an objection to a defective verdict before a jury is discharged is to provide it an opportunity to cure the defect by further deliberation." (*Juarez v. Superior Court* (1982) 31 Cal.3d 759, 764–765.) "The rule is designed to advance efficiency and deter gamesmanship." (*Keener, supra,* 46 Cal.4th at p. 264.) As the California Supreme Court has repeatedly stated, any other rule would incentivize parties to remain silent until the appeal, and few judgments would survive. (*Id.* at p. 265, citing *People v. Simon* (2001) 25 Cal.4th 1082, 1103.)

Bala concedes that he did not object to the verdict form in the trial court. He argues, though, that "there is no barrier to this court reviewing a clearly incorrect verdict form," citing Code of Civil Procedure section 647, which includes "giving an instruction" as one of the matters that is "deemed excepted to" under that statute. (Code Civ. Proc., § 647.) However, the statute does not include special verdict forms among the matters "deemed excepted to."

Nor is the special verdict form here "clearly incorrect," as Bala contends. On the contrary, the language Bala objects to—"participated in, assisted in, or encouraged the harassing conduct"—mirrors the language in CACI No. 2507A, the proposed special verdict form for a work environment harassment claim against an individual defendant pursuant to section 12940, subdivision (j). (CACI No. 2507A; see also, CACI No. 2522A [jury instruction].) As the directions for use with CACI No. 2522A state, the proposed jury instructions are "for use in a hostile work environment case if the plaintiff was the target of the harassing conduct and the defendant is also an employee of the covered entity. (Gov. Code, § 12940(j)(3).)" (CACI No. 2522A.)

Ultimately, Bala's focus on his conduct "standing alone" also ignores another of the jury's findings—that the harassing conduct was a substantial factor in causing harm to Ramirez. In other words, the jury was not instructed to view Bala's conduct in isolation. Even if Bala's conduct by itself did not cause harm to Ramirez, the jury

23

determined that the harassing conduct was a substantial factor in causing that harm, and Ramirez has not challenged that determination.[6]

### 2. Substantial evidence challenges

Bala argues that he did not engage in any improper "work-related" conduct toward Ramirez, and that his conduct was not "the type of severe and pervasive conduct which is necessary to sustain a claim of discriminatory harassment." Although he does not characterize it as such, Bala's argument is fundamentally a substantial evidence challenge to two of the jury's factual determinations.

As summarized above, the jury answered yes to the following questions on the special verdict form with respect to Bala: (1) was Ramirez subjected to harassing conduct because she was a woman; (2) did the harassing conduct occur in a work-related context; (3) was the harassment severe or pervasive; (4) would a reasonable woman in Ramirez's circumstances have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (5) did Ramirez consider the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (6) did Bala participate in, assist in, or encourage the harassing conduct; and (7) was the harassing conduct a substantial factor in causing harm to Ramirez?

Bala thus challenges the jury's second and third findings in this cause of action— that the harassing conduct occurred in a work-related context, and that it was severe or pervasive.

We must determine on the entire record whether there is substantial evidence, contradicted or uncontradicted, which will support the findings. (*Caldera, supra,* 25 Cal.App.5th at pp. 37–38.) The judgment will be upheld if it is supported by substantial

---

[6] We need not address Bala's separate argument that there was no basis for the jury to find him liable as an aider and abettor of the harassment of others. There is no evidence that the jury made such a finding or that Ramirez asserted that theory at trial.

24

evidence, "even if contrary evidence exists and the jury might have rendered a different result had it believed this evidence." (*Ibid.*)

However, an appellant bears the burden of demonstrating that a finding of fact is not supported by substantial evidence, including setting forth all the material evidence, and not merely the evidence favorable to him. (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173 (*Slone*).) "Unless this is done the error is deemed to be waived.' [Citations.]" (*Ibid.*, quoting *Foreman & Clark Corporation v. Fallon* (1973) 3 Cal.3d 875, 881 (*Foreman*).) "When an appellant's opening brief states only the favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact." (*Slone, supra*, at pp. 1173–1174, citing *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1072.)

As explained in the following sections, Bala has failed to carry that burden here.

### (a) Work-related conduct

Bala argues that, "when we properly focus on [his] conduct, it is evident that he [did not engage] in any improper conduct towards Plaintiff that was 'work-related.' " Further, he argues that "it is undisputed that [his] only actions were that he received the video while at home, viewed it, and shared it with Officer Childers, and in a text exchange with Officer Childers that same night he said Plaintiff was 'fucking hot.' "

However, Bala fails to set forth the evidence of his conduct at the workplace, where he discussed the video with Haro via the CDCR e-mail system, responding "That's awesome" to Haro's e-mail with the subject line "Video," stating, "SERNA is the dude."

Moreover, even where conduct occurs outside the workplace, it can still constitute sexual harassment if it occurred in a "work-related context." (*Atalla v. Rite Aid Corporation* (2023) 89 Cal.App.5th 294, 316 (*Atalla*), citing *Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1046; see also, *Capitol City Foods, Inc. v. Superior Court* (1992) 5 Cal.App.4th 1042, 1048 (*Capitol City Foods*) ["unwelcome sexual conduct perpetrated

25

by an agent, supervisor, or co-worker, which occurs elsewhere but is in some fashion work-related also constitutes sexual harassment within the meaning of [FEHA]"].)

When Bala received the video, he recognized Ramirez, a subordinate employee at the prison, and yet he still forwarded it to Childers, another supervising officer at the prison whom he indirectly supervised. As a supervisor with responsibility for enforcing the prison's sexual harassment policy, Bala's distribution of the video to a subordinate—together with the message that Ramirez was "fucking hot"—arguably served to approve and encourage further dissemination of the video to other prison employees. (See, e.g., *Okonowsky, supra*, 109 F.4th at pp. 1180–1181 ["evidence of management-level, intra-workplace ratification of or acquiescence to offsite conduct by employees, customers, or third parties can be particularly relevant to both the hostile work environment and employer liability elements of a Title VII claim"].)

This constitutes substantial evidence supporting the jury's factual finding that the harassing conduct occurred in a work-related context.

### *(b) Severe or pervasive harassment*

As we have stated, to prevail on a sexual harassment claim, the plaintiff must show that the harassing conduct was "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." (*Hughes, supra*, 46 Cal.4th at p. 1043, citing *Miller, supra,* 36 Cal.4th at p. 462.) "This element is disjunctive—if a single instance of the conduct (here, the viewing of the video) was severe enough on its own to create a hostile work environment, then it need not have been pervasive for this element to be satisfied." (*Abbt v. City of Houston* (5th Cir. 2022) 28 F.4th 601, 608 (*Abbt*), citing *Harvill v. Westward Communications, L.L.C.*, (5th Cir. 2005) 433 F.3d 428, 435.) Determining whether a hostile work environment exists depends on the totality of the circumstances. (*Hughes, supra*, at p. 1042.)

Bala has again failed to set forth all the material evidence on this point. (*Slone, supra,* 106 Cal.App.5th at p. 1173.) "Unless this is done the error is deemed to be waived.' [Citations.]" (*Ibid.*, quoting *Foreman, supra,* 3 Cal.3d at p. 881.) For instance, Bala does not address the humiliation Ramirez experienced upon learning that the video had been circulating at the prison for over a year and that she had likely been face to face with numerous officers who had viewed and distributed it. In *Abbt*, a firefighter sued her former employer for sexual harassment and retaliation related to the repeated viewing by co-workers of a private, intimate video of her. (*Abbt, supra*, 28 F.4th at p. 604.) In reversing the district court's grant of summary judgment for the defendant, the Fifth Circuit Court of Appeals held that, looking at the totality of the circumstances, "a reasonable person could consider the repeated viewing of her intimate, nude video by her coworkers to be sufficiently severe to constitute sexual harassment," and that "the conduct was objectively offensive, and could have objectively created a hostile work environment." (*Id.* at p. 608.) Similarly here, Ramirez's humiliation constitutes substantial evidence supporting the jury's determination that the harassing conduct was severe or pervasive.

Additionally, there was substantial evidence supporting a determination that CDCR's response to Ramirez's complaints was inadequate and " 'reinforced rather than remediated' " the sexually harassing conduct, thereby contributing to the hostile work environment. (*Okonowsky, supra*, 109 F.4th at p. 1182.) For instance, the warden told Ramirez there was nothing he could do about the situation, and compared her to Kim Kardashian and other celebrities making sex tapes. The prison's office of internal affairs did not commence its administrative investigation until May 2019, more than a year after her initial complaint, during which time Ramirez received no updates. She was also told by the office of internal affairs that the investigation had been closed and had been returned to the prison, which would decide whether there would be any further investigation. This constituted substantial evidence supporting a finding of severe or

27

pervasive harassment stemming from CDCR's failure "to take immediate and corrective action in response to a co-worker's … sexual harassment ... [that] the employer knew or should have known about.' " (*Okonowsky, supra*, at p. 1185.)

Ramirez also testified that co-workers gave her the cold shoulder and treated her differently; officers with whom she had had a good rapport no longer engaged in conversations with her; she wondered every day who else had seen the video; some men at work behaved inappropriately with her, including one who told her he was looking for someone to have sex with and asked if she knew of anyone who might be interested, and another married man who asked her to take a hike with him; and, White was intentionally haunting and provoking her.

This constitutes substantial evidence supporting the jury's finding that the harassment was severe or pervasive, based on the nature of the conduct, how often and over what period of time it occurred, the circumstances under which it occurred, whether it was physically threatening or humiliating, and the extent to which it unreasonably interfered with Ramirez's work performance. (*Caldera, supra*, 25 Cal.App.5th at pp. 38–39; CACI No. 2524.)

Rather than acknowledge this evidence and explain why it is insufficient, Bala again focuses only on his specific actions. For instance, he argues that his "only actions" were receiving the video while at home, viewing it, and sharing it and texting about it with Childers. For that reason, he contends, "his actions did not create a workplace with discriminatory insult and ridicule," and there is no evidence that he ever treated Ramirez differently or harassed her in the workplace. "In short," he concludes, "there is nothing in the record that supports an argument that [his] conduct, standing alone, would be sufficient to sustain a claim of discriminatory harassment."

Yet, Bala ignores the "totality of the circumstances" that the jury considered in determining that the harassment was severe or pervasive. (*Hughes, supra*, 46 Cal.4th at

28

p. 1044.)  He has failed to demonstrate that substantial evidence did not support the jury's finding that the harassment was severe or pervasive.

### D.  CDCR and White's appeal (H049702)

CDCR and White's arguments on appeal fall into two general categories.  First, they argue that CDCR cannot be held liable under FEHA as a matter of law for private, off-duty conduct.  Second, they argue there is no substantial evidence to support the jury's verdict on the sex harassment or sex discrimination causes of action.

#### 1.  Arguments regarding alleged "off-duty" conduct

CDCR and White contend that "[t]he verdict on Ramirez's sexual harassment claim must be reversed because Ramirez's claim hinges on the single legal issue of whether a government employer can be held liable for the private, off-duty sharing of a sex video."

This argument fails for multiple reasons.  First, CDCR and White mischaracterize the facts.  This case is not about the private, off-duty sharing of the video, but rather about the workplace environment Ramirez experienced after she learned the video had been circulating among prison staff.  Whether a government employer can be held liable for private, off-duty conduct is therefore not a legal issue in this appeal.

Second, although they characterize their argument as presenting a legal issue that must be decided as a matter of law, in fact they present a substantial evidence challenge to the jury's factual determinations.  For instance, they argue that, "[t]o be actionable FEHA workplace sexual harassment, Ramirez had to be subjected to 'sexual advances, conduct, or comments that were severe enough or sufficiently pervasive to alter the conditions of her employment and create a hostile or abusive work environment.' "  They contend that "Ramirez was not subjected to severe or pervasive workplace harassment," thereby challenging the jury's factual determination to the contrary.  And they argue that "[w]ith one exception, the video was viewed and shared outside of the workplace," and

29

that "the tangential impact to the workplace from gossip about the sex video does not amount to workplace harassment."

These substantial evidence challenges fail. Contrary to CDCR and White's contention, Ramirez's claims did not "arise from private activities that did not involve CDCR at all." Instead, they arose directly from her experience at the workplace.

For instance, in May or June 2017, Ramirez was first approached by Bravo and asked if the rumors were true that a video of her and Serna having sex was circulating at the prison, which he had heard about from Morales.

In March 2018, Ramirez received a phone call from Haley who told her that Block had said the video was circulating at the prison and had been sent to her husband, Haynes. Upon being confronted by Ramirez, Serna admitted to having shared the video with Muñoz and possibly also Mariscal.

Learning that the video had been circulating at the prison for over a year, and believing she had likely been face to face with numerous officers who had viewed and distributed it, Ramirez felt embarrassed to come to work, and was "trying to keep it together and not break." As discussed above, there was substantial evidence of a hostile work environment including the humiliation of knowing that the video had been circulating at the prison for over a year and not knowing who had viewed it. (*Abbt, supra*, 28 F.4th at p. 604.)

Yet, when she met with Koenig on March 30, 2018, the warden told her there was nothing he could do about it, and compared her to Kim Kardashian and other celebrities making sex tapes, making her feel "slut shamed" and anxious. Ramirez also learned from Koenig that Serna had shown the video to White as well.

Ramirez heard directly from Serna that Graves had a copy of the video and had offered to show it to another officer, and that Block had seen the video and had "spread the word amongst the nursing staff."

30

As a result of all this, Ramirez's workplace environment became hostile, uncomfortable and stressful. Co-workers gave her the cold shoulder and treated her differently or no longer spoke with her, and she wondered every day who else had seen the video. Some men also behaved inappropriately with her at work, one telling her he was looking for someone to have sex with, and another married man asking her to take a hike with her and saying his wife did not need to know. Her interactions with White were particularly uncomfortable, as Ramirez felt that he was haunting and provoking her.

This evidence does not constitute "private activities that did not involve CDCR at all." It also contradicts CDCR and White's claim that Ramirez "failed to present any evidence at trial that [] the video was ever discussed with her in the workplace, discussed in her presence in the workplace, or that she was subjected to inappropriate comments about the video in the workplace." And, it contradicts their claim that the evidence "showed that Ramirez was never subjected to such extreme or repetitive workplace conduct so as to alter the terms and conditions of her employment."

In short, substantial evidence supports the jury's findings that the harassing conduct was work-related and severe or pervasive.[7] (*Atalla, supra*, 89 Cal.App.5th at p. 316 [even where the relevant conduct occurs outside the workplace, it can still constitute sexual harassment if it occurred in a "work-related context"]; *Capitol City Foods, supra*,

_____

[7] The case law CDCR and White rely on is inapposite for the same reason—the cases merely concluded there was insufficient evidence to support the claims in those particular circumstances. (See, e.g., *Lyle, supra*, 38 Cal.4th 264 [based on totality of circumstances, no reasonable trier of fact could conclude the relevant language constituted harassment directed at plaintiff because of her sex within the meaning of the FEHA, or that the "particular comments were severe enough or sufficiently pervasive to create a work environment that was hostile or abusive to plaintiff in violation of the FEHA"]; *Capitol City Foods, supra*, 5 Cal.App.4th 1042 [where plaintiff was raped by her supervisor outside of work hours at supervisor's parents' house, insufficient evidence of nexus between supervisor's conduct and his employment to create triable issue of material fact]; *Atalla, supra*, 89 Cal.App.5th 294 [offsite and afterhours lewd texts from manager to employee insufficient to survive summary judgment were individuals were friends prior to working together].)

31

5 Cal.App.4th at p. 1048 [" 'unwelcome sexual conduct perpetrated by an agent, supervisor, or co-worker, which occurs elsewhere but is in some fashion work-related also constitutes sexual harassment within the meaning of the Act' (Citation)"]; *Caldera, supra*, 25 Cal.App.5th at pp. 38–39 [whether conduct was severe or pervasive depends on the nature of the conduct, how often, and over what period of time, it occurred, circumstances under which it occurred, whether it was physically threatening or humiliating, and the extent to which it unreasonably interfered with the employee's work performance].)

CDCR and White also argue that the jury's verdict, if allowed to stand, "would improperly impose liability on employers for off work actions outside their control," and would be "contrary to public policy protecting the privacy rights of individuals." They contend that CDCR is "constitutionally prohibited from reviewing the contents of its employees' personal phones to monitor the private, non-work-related communications of its employees," and that FEHA "was never intended to reach the purely private, non-work activity of employees."

They again mischaracterize the facts of this case, though. The jury determined that the harassment was "work-related." This is not an instance where FEHA is reaching "purely private, non-work activities." To the extent CDCR and White disagree with the jury's determination, that amounts to a substantial evidence challenge which we have addressed.

CDCR and White next argue that the verdict cannot stand "because the jury apparently concluded that CDCR's after-the-fact discipline of Serna, Bala, and Paluck was evidence that actionable workplace harassment occurred." Such a conclusion, they argue, would penalize CDCR for imposing discipline under its allegedly zero-tolerance anti-harassment policy.

However, they provide no evidence that the jury reached any such conclusion or otherwise ascribed any particular weight to the discipline CDCR levied against its

employees. In any case, as we explain below, substantial evidence supports the jury's findings even aside from the evidence of CDCR's discipline.

## 2. *Additional substantial evidence arguments*

CDCR and White argue that substantial evidence does not support the jury's verdicts on the sexual harassment and sex discrimination causes of action. First, they argue, the sexual harassment verdict must be overturned because there was insufficient evidence to establish that Ramirez was subjected to severe or pervasive sexual harassment by any CDCR supervisor or non-supervisor. Second, they argue the sex discrimination verdict must be overturned because there was insufficient evidence to establish that Ramirez was constructively discharged, and because Ramirez "failed to rebut CDCR's legitimate and non-discriminatory reasons for the course and progression of the criminal and administrative investigations and disciplinary decisions."

### (a) *Sexual harassment*

CDCR and White argue that Ramirez was never subjected to severe or pervasive sexual harassment by any supervisor, including specifically White or Bala.

With respect to White, they argue that his "alleged actions involve the passive act of receiving the video outside of Ramirez's presence, not reporting the video to CDCR, and the two instances—once in May 2019 and once in June 2019—in which White walked to and from Captain Metcalf's office near Ramirez's work area." According to CDCR and White, "[t]hose actions are nothing more than isolated, sporadic events as opposed to the required concerted pattern of harassment necessary to establish severe and pervasive conduct."

Similarly, with respect to Bala, they argue that his actions consisted only of "receiving the video outside of the workplace, sharing the video once outside of the workplace, and not reporting the video to CDCR [which conduct] cannot be viewed by a reasonable person as severe or pervasive workplace harassment because there is

absolutely no pattern of a repeated, routine, or generalized harassment directed at Ramirez within the workplace."

We reject these arguments for multiple reasons. First, CDCR and White again ignore the totality of the circumstances that must be considered in determining whether the harassing conduct was sufficiently severe or pervasive to create a hostile or abusive working environment. (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 951 (*Rehmani*), citing *Miller, supra*, 36 Cal.4th at p. 462.) The totality of the circumstances includes the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. (*Ibid.*)

CDCR and White attempt to sidestep this framework and instead focus on the individual conduct of White and Bala in isolation. But the jury was not required to do so and in fact, was specifically instructed to consider all those factors when determining whether the harassing conduct was severe or pervasive. Challenges to the sufficiency of the evidence which treat each incidence or comment in isolation have been rejected by the courts. (See, e.g., *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1227, citing *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 23; *Miller, supra,* 36 Cal.4th at p. 462.)

As we have summarized, there is substantial evidence in the record to support the jury's determination that the totality of the harassing conduct was severe or pervasive. CDCR and White's attempt to minimize the nature or degree of White and Bala's individual conduct does not undermine that evidence.

Second, CDCR and White largely challenge the credibility and weight of the evidence. For instance, they argue that White's behavior around Ramirez and her office "cannot constitute sexual harassment" because "[m]erely walking back and forth to an office location where an employee is needed at work does not exhibit harassing behavior." Similarly, they state that "Ramirez's discomfort in these isolated instances

34

cannot be construed by a reasonable person as severe and pervasive hostile workplace treatment."

However, we do not reweigh the evidence or judge the credibility of witnesses, and we must resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict." (*Mathews, supra,* 43 Cal.App.5th at p. 251.)  Here, Ramirez described White's conduct as haunting and provoking her.  White had also initially responded to Serna's text by saying, "You're a savage," evidence which the jury was entitled to construe as encouragement of further distribution of the video.  White had also prevaricated regarding whether he had distributed the video to anyone, conceding in his April 2018 memo to Koenig that "due to the large time [lapse] I cannot be for certain" whether he had shared it.  The jury was entitled to construe White's professed failure to recall as an implied admission that he had shared the video, or as evidence of material falsity warranting a wholesale rejection of his testimony.

Together with the other evidence summarized above, this constitutes substantial evidence supporting the jury's verdict.  (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 1000 [substantial evidence is any evidence that is reasonable in nature, credible, and of solid value].)

Third, by focusing only on the individual conduct of White and Bala, rather than the totality of the circumstances, CDCR and White ignore the foreseeable consequences of their actions.  For instance, CDCR and White claim that Bala only received the video outside of the workplace and shared it once outside of the workplace, which they argue does not amount to severe or pervasive harassment.  Similarly, they argue that because Ramirez admitted she was not aware of Bala's conduct until August 2019, she "could not have experienced severe and pervasive workplace harassment over an act of which she was not aware."

35

However, "[c]ommon sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct [that] a reasonable person in the plaintiff's position would find severely hostile or abusive.' " (*Rehmani, supra*, 204 Cal.App.4th at pp. 951–952, quoting *Miller, supra*, 36 Cal.4th at p. 462.) The jury here was entitled to exercise its common sense and sensibility to social context to conclude that Bala's sharing of the video to another co-worker was conduct that a reasonable person in Ramirez's position would find severely hostile or abusive. Although Ramirez was not aware that Bala had forwarded the video to Childers until later, that conduct—in addition to him discussing the video with Haro—resulted in Childers sharing it with Paluck, who in turn shared it with Sedano and discussed it with White. As she explained in her March 29, 2018, memo to Khan, which was read into evidence at trial, upon learning that the video had been passed around the prison for a year without her knowledge, she was "at point where I feel embarrassed to come to work, but since its all already out there and I might well in fact [have been] face to face with the many officers that viewed and distributed that video, I am trying to keep it together and not break."

In ignoring these foreseeable consequences of White's and Bala's actions, CDCR and White also ignore two other factual determinations by the jury—that the harassing conduct was a substantial factor in causing harm to Ramirez, and that White and Bala participated in, assisted in, or encouraged, the harassing conduct. In other words, the jury did not examine White's and Bala's conduct in the isolated manner contended by CDCR and White here.[8]

---

[8] CDCR and White's separate argument that Ramirez was not subjected to severe or pervasive workplace sexual harassment by any non-supervisory CDCR employee fails for the same reasons as its arguments with respect to supervisors. In short, they ignore the totality of the circumstances and the substantial evidence summarized above, and they ask this court to reweigh the evidence and make inferences against the jury's verdict.

### (b) Sex discrimination

CDCR and White argue that CDCR never took an adverse employment action against Ramirez, and that there was insufficient evidence to establish that she was constructively discharged.

As a threshold matter, Ramirez's cause of action for sex discrimination did not allege that CDCR took an adverse employment action. Instead, it alleged that Ramirez was constructively discharged.

A constructive discharge occurs " 'when the employer's conduct effectively forces an employee to resign. Although the employee may say "I quit," the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation.' " (*Simers v. Los Angeles Times Communications, LLC* (2018) 18 Cal.App.5th 1248, 1269 (*Simers*), quoting *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244–1245 (*Turner*).)[9]

"To establish a constructive discharge, an employee must prove 'that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.' " (*Simers, supra*, 18 Cal.App.5th at p. 1269, quoting *Turner, supra*, 7 Cal.4th at p. 1251.) To amount to a constructive discharge, "adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra*, at p. 1247.) "The standard by

---

[9] "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful* discharge." (*Turner, supra*, 7 Cal.4th at p. 1251.)

which a constructive discharge is determined "is an objective one, and the proper focus is on the working conditions themselves.' " (*Simers, supra*, at p. 1269, quoting *Gibson v. Aro Corporation* (1995) 32 Cal.App.4th 1628, 1637.)

An employee "cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (*Turner, supra*, 7 Cal.4th at p. 1246.)

"An employer's actual knowledge of the existence of [intolerable working] conditions, and subsequent failure to remedy them, may constitute circumstantial evidence that the employer deliberately forced the employee to resign." (*Turner, supra,* 7 Cal.4th at p. 1249.) "[T]he requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Id*. at p. 1251.)

CDCR and White argue that Ramirez "was never subjected to such intolerable conditions so as to force a reasonable person to leave their job." This amounts to a substantial evidence challenge to the jury's determination that CDCR constructively discharged Ramirez.

The evidence we have summarized above—which supports the jury's separate determination that the harassing conduct was severe or pervasive—also constitutes substantial evidence supporting the jury's finding regarding constructive discharge. Ramirez learned in March 2018 that the video had been circulating at the prison for over a year. She realized then that she had likely been face-to-face with numerous co-workers who had viewed and distributed the video. She felt embarrassed to come to work and was "trying to keep it together and not break." She had heard that at least Muñoz, Block, Mariscal, Haynes, White, and Graves had seen the video, and worried that numerous others at the prison had almost certainly seen or discussed it, a fact corroborated by

38

Serna's testimony that at least 50 people had discussed it with him. She had also been forced to discuss the video with the prison warden and endure his comments regarding celebrity sex tapes.

Those conditions were also compounded after Ramirez complained to her employer. Koenig expressly told her "there was nothing he could do about the distribution, that it was Serna's phone, and he could do whatever he wanted with his phone, and that he had no control over what his officers were doing outside of the workplace, that he had to be honest that there was nothing that he could do for me, that the video itself could be out there, so there was nothing that he could really do."

Co-workers gave her the cold shoulder and treated her differently, while some men behaved inappropriately toward her at work. Ramirez felt White was haunting and provoking her, and yet he was assigned to work near her office even after she specifically complained about her interactions with him. On June 5, 2019, Ramirez wrote a memo to Metcalf stating: "I want to report that about two weeks ago. Lt. Che White was assigned to work in the opposite yard (B) area. While he was assigned to B Yard, he remained at my work area during his shift. I've made two sexual harassment complaints against Mr. White to the prison, and I am extremely uncomfortable working with him. I ask that the prison not assign Lt. White to work in work area." Despite that, White was again assigned to work around Ramirez.

Ramirez also grew increasingly frustrated and "abandoned" by what she felt was the lack of response or internal investigation by the prison. After Khan submitted a request for investigation in April 2018, Ramirez followed up with him and his successor multiple times seeking updates, but received none. After she submitted her equal employment opportunity complaint to the office of internal affairs on June 7, 2018, she was informed that the allegations had "already been forwarded to OIA and accepted as an investigation, which is currently open." However, after she followed up with the office of internal affairs, she was told the investigation had been closed by their office, and had

been returned to the prison, which would decide whether there would be any further investigation.

She testified at trial that "[t]here was nothing going on. Nobody was giving me updates. I had already complained twice, once to CTF and once to OIA. So I just felt nothing was going on. There was nothing that -- I was still working with my aggressors or potential aggressors. It just made it difficult for me to come to work and, like I mentioned before, having to possibly work with the same people that saw me on the video naked."

Ramirez then left CDCR at the end of August 2019. She testified that she "just couldn't take it anymore. Nothing was being done. Everybody that I, at least, known was still working. There was no activity, or, at least, I wasn't getting any updates from the prison as far as how the investigation was going, or -- I just couldn't handle it anymore, so I just decided to leave."

This constitutes substantial evidence supporting a finding that the conditions giving rise to Ramirez's resignation were sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve her employer, and that CDCR had knowledge of the existence of intolerable working conditions, and subsequently failed to remedy them. (*Turner, supra,* 7 Cal.4th at pp. 1246, 1249, 1251.)

CDCR and White argue that CDCR took Ramirez's claims seriously and initiated prompt investigations. They note that the criminal investigation of Serna commenced in October 2018 and that the office of internal affairs decided to hold the administrative investigation in abeyance until after the criminal investigation concluded. That was done "[t]o further ensure that any criminal conduct discovered would be fully prosecuted, [and] to protect the integrity of the criminal investigation because it would help prevent any compelled statements obtained by the administrative investigators from making their way to the criminal investigators."

40

However, as Ramirez notes, the CDCR operations manual, introduced into evidence at trial, expressly provides that "[a]dministrative investigations may be conducted concurrently or subsequent to a criminal investigation," and that such investigations "shall not be delayed unless it clearly would jeopardize the criminal prosecution." In addition, Ramirez's expert in workplace investigations testified that there was no reason the prison could not have conducted the administrative investigation concurrently with the criminal investigation. And, even assuming there were reasons to delay the administrative investigation as to Serna, CDCR offers no explanation for delaying it as to the other employees.

CDCR and White rely on case law for the proposition that "[o]nce an employer produces a legitimate reason for the adverse employment action at trial, the employee must then provide substantial evidence to show that the employer's proffered justification is mere pretext." However, the cited authority is inapposite, as it dealt with adverse employment actions in the context of FEHA retaliation claims, rather than constructive discharge. (See, e.g., *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703; *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830; *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207.)

Finally, CDCR and White argue that the jury's verdict on Ramirez's cause of action for failure to prevent discrimination and harassment must be reversed because she was neither sexually harassed nor subjected to sex discrimination. Because we have rejected their underlying arguments, this argument fails as well.

### E. Attorneys' fees and costs (H050113)

The trial court awarded Ramirez $1,298,983.50 and $28,287.50 in attorneys' fees and costs, respectively.

CDCR and White argue that the trial court abused its discretion by applying a 1.5 multiplier to the lodestar amount because (1) it failed to make the appropriate findings to

41

justify the enhancement, and (2) none of the relevant factors support applying a multiplier in this case.

As we explain below, we conclude the trial court did not abuse its discretion.

### 1. *Factual background*

In her motion for attorneys' fees filed on January 10, 2022, Ramirez sought a total amount of $1,300,530 in attorneys' fees and $28,287.50 in expert fees. The requested attorneys' fees amount represented a lodestar of $867,020 with a 1.5 multiplier.

The lodestar was determined by using hourly rates ranging from $450 for lead counsel to $350 for associates, as well as $160 for paralegals and $80 for legal assistants, with a total of $2,531.40 hours among all billers. The requested 1.5 multiplier was based on Ramirez's counsel having taken the matter on a contingency basis, the complexity and length of the litigation, and the success achieved.

CDCR and White opposed the motion, arguing that: (1) the requested fees should be reduced because the matter was overstaffed, and the rates were not reasonable; (2) the lodestar should be reduced because counsel's time entries were inflated and vague, Ramirez's approach to the litigation was overly aggressive and costly, three initial defendants were dismissed, the jury rejected the retaliation cause of action, and the fees will be paid by taxpayers; and (3) Ramirez was not entitled to a multiplier because the contingent nature of her fee arrangement did not warrant it, counsel was not precluded from handling other cases, the lawsuit did not advance the public interest, and the quality of the representation was not exceptional.

In reply, Ramirez agreed to reduce the fee request by $13,680.

The trial court held a hearing on the motion on March 11, 2022, at which it stated that it was granting the motion. The court explained the basis of its ruling, including that the case was "fought very hard, and Plaintiff's counsel earned their money on this one." The court specifically commended Ramirez's counsel: "Overall, it's probably, in terms of billing and hourly rates sought, the most reasonable fee motion I've seen in years."

The court acknowledged that the jury rejected Ramirez's retaliation cause of action, but explained that "this case was so factually intertwined with each theory of liability … in this case, they were so close." The court also recognized that "it was a risky case" for Ramirez's counsel to take on, and "it clearly consumed a lot of time." And the court emphasized that the case was taken on a contingent basis and that "it clearly consumed a lot of time." As a result, the court held, "this is a case where a multiplier of 1.5 is appropriate."

The court noted that counsel's hourly rates were reasonable as well: "the threshold hourly billing rates are completely in line with what would be awarded in this community. I mean, $450 an hour for the main attorneys in a firm is in keeping with Monterey County rates. I see many cases where counsel come in from other parts of the state and want to get 700, 800, 900 or $1,000 an hour, and they don't seem to appreciate what the local hourly rates are."

The court also addressed CDCR and White's argument that the award should be reduced to reflect the fact that it will be paid by taxpayers, but recognized competing policies, including that "part of what the taxpayers pay for is to have safe workplaces or workplaces that are free from discrimination. And so I think as a policy matter, one cannot say that it's inappropriate to award these fees."

In closing, the trial court stated: "And if you ask anybody, they'd probably tell you I'm as hard on fee requests as anybody, and I take a very close look at them. [¶] But this is one of those cases where I believe that the amount requested is appropriate under the circumstances."

The written order was entered on April 14, 2022. The order expressly stated that the "basis and reasoning" of the court's order were "more fully specified in the transcript of the proceedings which are incorporated herein by reference."

The amended judgment was then entered on April 22, 2022, incorporating the jury verdict and providing updated amounts of $709,555 in damages, $1,298,983.50 in

43

attorneys' fees, $28,287.50 in expert witness fees, and $58,275.79 in costs, with defendants to be jointly and severally liable.

## 2. *Applicable law and standard of review*

In a FEHA action, the trial court has the discretion to award reasonable attorneys' fees to the prevailing party. (§ 12965, subd. (c)(6); *Pollock v. Kelso* (2025) 107 Cal. App. 5th 1190, 1195 (*Pollock*).) The "fundamental factor" governing such an award is therefore "reasonableness." (*Pollock, supra*, at p. 1195.)

As in other fee award contexts, "[t]rial judges are in the best position to evaluate attorney fee awards." (*Pollock, supra*, 107 Cal.App.5th at p. 1195, citing *Laffitte v. Robert Half International Inc.* (2016) 1 Cal.5th 480, 488.) The trial court judge "see[s] the lawyers' day to day labors and can judge quality over the long haul. Awarding fees is a recurring task on a trial court's docket. Experienced trial judges routinely see fee applications and develop a sense of what is customary and reasonable." (*Pollock, supra,* at p. 1195.)

Reviewing courts therefore "owe considerable deference to trial court decisionmaking about attorney fee awards and thus review for an abuse of discretion." (*Pollock, supra*, 107 Cal.App.5th at p. 1195.) "We presume the trial court's award is reasonable and the court considered appropriate factors in reaching its decision, even though the court may not have rendered a written ruling. The trial court is not required to state each charge it finds reasonable or unreasonable, nor need it issue a statement of decision." (*Id.*, citing *Snoeck v. ExakTime Innovations, Inc.* (2023) 96 Cal.App.5th 908, 920–921.)

Accordingly, "[w]e will not disturb the trial court's judgment unless it is clearly wrong. We accept the trial court's factual findings supported by substantial evidence, and we imply findings to support the court's order. The burden is on the objector to show error." (*Pollock, supra*, 107 Cal.App.5th at p. 1195.)

44

To determine an appropriate amount of an attorneys' fees award, the trial court must first establish the "lodestar," which is " 'the product of the number of hours worked by the attorneys and a reasonable fee per hour.' " (*Taylor, supra,* 222 Cal.App.4th at p. 1249, quoting *Greene v. Dillingham Construction, N.A., Inc.* (2002) 101 Cal.App.4th 418, 422.)

After setting the lodestar, the trial court also has the discretion to apply a "multiplier" to increase or decrease the ultimate amount awarded, based on a variety of factors. (*Taylor, supra*, 222 Cal.App.4th at p. 1249.) The purpose of the multiplier "is to compensate for extrinsic factors such as the risk of nonpayment (the contingency factor), the public interest advanced by the case, the difficulty of the issues involved, and the skill of the attorneys." (*Caldera, supra*, 48 Cal.4th at p. 1135, citing *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135 (*Ketchum*); see also, *Northwest Energetic Services, LLC v. California Franchise Tax Board* (2008) 159 Cal.App.4th 841, 879 [considering extent to which the litigation precluded other employment by the attorneys; whether the award would be against the state and fall upon taxpayers].)

### 3. *Analysis*

CDCR and White first argue that the trial court abused its discretion because it failed to make any specific findings to support the multiplier. They cite *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615 (*Ramos*), for the proposition that when a trial court "decides to depart from the lodestar attorney fee approach to enhance that amount with a multiplier, it must first make appropriate findings on the factors recognized by case law." According to CDCR and White, the trial court "at no point made any specific findings in support of its ruling granting the 1.5 multiplier," so the order and judgment must be reversed.

However, as the factual background above demonstrates, the trial court did make findings in support of its ruling. It explained at the hearing that, among other things, the case was "risky" and Ramirez's counsel took it on a contingency basis. It noted that the

case was "fought very hard, and Plaintiff's counsel earned their money on this one." The court recognized that the litigation was time-consuming and precluded other employment by counsel, and it considered the impact on state taxpayers. These are precisely the factors a trial court should consider when exercising its discretion to decide whether to apply a multiplier. (*Caldera, supra*, 48 Cal.4th at p. 1135.)

CDCR and White argue that the "trial court merely concluded, without analysis or explanation, that counsel took the case on contingency basis, spent a lot of time on the case, and obtained a good result," but "failed to provide specific analysis beyond these broad conclusions." We disagree. The trial court's statements at the hearing clearly set forth the bases for its decision to apply a 1.5 multiplier.

Moreover, as *Ramos* recognized, "[i]n reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no reasonable basis for the court's action can be shown. [Citation.]" (*Ramos, supra*, 82 Cal.App.4th at p. 621; see also, *Gorman v. Tassajara Development Corporation* (2009) 178 Cal.App.4th 44, 67 ["We find no California case law ... requiring trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount"].)

CDCR and White also argue that the trial court abused its discretion because the factors supporting a multiplier are not present. They make five distinct arguments in support of this contention.

First, they claim that Ramirez's counsel showed only "ordinary skill" which was already accounted for in the lodestar. CDCR and White characterize this as a "fairly routine employment case," and argue that "nothing in the record indicates that Ramirez's attorneys demonstrated extraordinary skill in their litigation of this case."

However, the trial court determined that the case was "fought very hard, and Plaintiff's counsel earned their money on this one." The court also felt that "there was a very, very good result obtained by plaintiff's counsel," so that "this is a case where a multiplier of 1.5 is appropriate."

We cannot conclude that the trial court abused its discretion in making these determinations. As we have noted, trial court judges "are in the best position to evaluate attorney fee awards," because they "see lawyers' day to day labors and can judge quality over the long haul," and "routinely see fee applications and develop a sense of what is customary and reasonable." (*Pollock, supra*, 107 Cal.App.5th at p. 1195.) Moreover, the evidence in the record supports the trial court's determinations. The litigation involved a lengthy and convoluted factual history, as well as complex combinations of witnesses, defendants, and causes of action. (*Pollock, supra*, at p. 1195 ["We accept the trial court's factual findings supported by substantial evidence"].)

We also reject CDCR and White's contention that the multiplier double-counted any premium placed on the skill of counsel because it was already included in the lodestar. They argue that "the trial court necessarily assessed the skill of Ramirez's attorneys when it awarded their usual hourly rates and determined they were reasonable for the lodestar amount."

As our Supreme Court has recognized, a trial court "should also consider the degree to which the relevant market compensates for contingency risk, extraordinary skill, or other factors[.] We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar. The factor of extraordinary skill, in particular, appears susceptible to improper double counting; for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar. A more difficult legal question typically requires more attorney hours, and a more skillful

47

and experienced attorney will command a higher hourly rate." (*Ketchum, supra*, 24 Cal.4th at pp. 1138–1139.)

Again, we defer to the trial court's discretion in making this determination here, and CDCR and White have not identified anything in the record to suggest that the trial court abused that discretion. The evidence in the record also shows that the trial court did not consider counsel's rates to include any such premium: "Overall, it's probably, in terms of billing and hourly rates sought, the most reasonable fee motion I've seen in years." As the Supreme Court has acknowledged, there is no prohibition on including the skill of counsel as a factor that warrants a multiplier where doing so would not unfairly double count: "a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation." (*Ketchum, supra*, 24 Cal.4th at p. 1139.) To the extent the trial court considered counsel's skill as a factor in awarding the multiplier here, it was not an abuse of discretion to do so.

Second, CDCR and White argue that the contingent nature of the fee arrangement was already accounted for in the lodestar and was not sufficiently risky to warrant the multiplier. However, there is no evidence in the record that the contingent nature of the representation was a factor in establishing the lodestar. CDCR and White cite counsel's declaration in support of the motion for attorneys' fees, wherein she stated that her "hourly rate for work performed in connection with this case is $450.00 per hour, which is my usual and customary rate for work of this nature." According to CDCR and White, "work of this nature" necessarily means "a contingency fee employment case wherein counsel took on the case knowing that there was no guarantee that Ramirez would prevail at trial." However, the cited portion of counsel's declaration made no reference to the contingent representation—instead, the immediately preceding sentence stated that her "law practice consists primarily of employment litigation, on both the plaintiff and

48

defense sides, including harassment, discrimination, retaliation, and wrongful termination cases, as well as wage and hour class action lawsuits and representative actions." Thus, "work of this nature" appears to refer to counsel's employment litigation practice in general.

Nor does the trial court appear to have double-counted the contingency factor in the lodestar, as CDCR and White assert. Instead, the court expressly stated that, "because it was taken on a contingent basis and there was a very, very good result obtained by Plaintiff's counsel, I think the multiplier is worth it."

Third, CDCR and White argue that "there is no evidence in the record that Ramirez's attorneys were prevented from taking other cases." They contend that "counsels' billing records establish that the amount of time each attorney spent on this case per year was a mere fraction of the total amount of hours the average attorney bills in a year," and "show that they were not precluded from other employment." According to CDCR and White, "clearly, nothing about this case would have prevented any one of those 14 individuals from taking on other work."

However, the trial court expressly addressed this argument and rejected it. As the court explained at the hearing, it "believes that this did, in fact, interfere with the ability to take on other work." Further, it stated: "Now, you can spread that out, divide the number of hours that were taken during the trial and spread them out over the number of years that this case was in existence and parse the numbers so that it looks like it was only a few hours a month. But the reality is, it was extremely intense at the end with the amount of trial work that went in."

The trial court did not abuse its discretion is determining that the litigation precluded other employment for Ramirez's attorneys and using that as a factor on which to base the multiplier.

Fourth, CDCR and White argue that, "[a]lso weighing against a multiplier is the fact that the attorneys' fees award will ultimately fall on California's taxpayers."

However, as discussed above, the trial court addressed this factor as well, and concluded that "part of what the taxpayers pay for is to have safe workplaces or workplaces that are free from discrimination. [¶] And so I think as a policy matter, one cannot say that it's inappropriate to award these fees." The trial court did not abuse its discretion in reaching that conclusion.

Fifth, CDCR and White argue that "the fact that Ramirez brought this lawsuit primarily to protect her own individual rights and advance her own economic interest also weighs against a multiplier." However, as we have just noted, the trial court recognized the public benefit from the litigation in ensuring safe workplaces free from discrimination. To the extent the trial court based the multiplier on this factor, it was not an abuse of discretion.

Finally, CDCR and White argue that the judgment must be corrected to reflect the correct interest rate of seven percent, rather than 10 percent. They argue that "courts have long held that judgments against public entities are subject to a seven percent interest rate as set forth in Article 15, section 1 of the California Constitution." However, CDCR and White did not raise this issue in the trial court. Accordingly, we consider it forfeited. (*People v. Ramirez* (2008) 159 Cal.App.4th 1412, 1422 [even if asserted error constitutes action in excess of trial court's jurisdiction, it is forfeited if not timely asserted].)

### III.    DISPOSITION

The judgments in H049689 and H050113 are affirmed. Ramirez may recover her costs on appeal.

50

_____
                    Wilson, J.


WE CONCUR:




_____
            Lie, Acting P. J.




_____
            Bromberg, J.




*Ramirez v. Bala*
H049689

*Ramirez v. California Department of Corrections & Rehabilitation et el.*
H049702

*Ramirez v. California Department of Corrections & Rehabilitation et al.*
H050113